UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANDREW DAVENPORT                                              CIVIL ACTION

VERSUS                                                        NO. 13-4828

WAYNE COOK, ET AL.                                            SECTION "B"(1)

**REPORT AND RECOMMENDATION**

Plaintiff, Andrew Davenport, a state prisoner, filed this civil action pursuant to 42 U.S.C. § 1983 against Assistant Warden Wayne Cook, Dr. Casey McVea, Nurse Bessie Carter, and Nurse Mary Jo Johnson. In this lawsuit, plaintiff claims that he was denied adequate medical care for a broken hand while incarcerated at the B.B. "Sixty" Rayburn Correctional Center.

Specifically, plaintiff makes the following allegations in this lawsuit: On April 29, 2012, plaintiff injured his hand, requested medical assistance, and was given Tylenol by the prison nurse. The following day, he was seen by the prison doctor, who ordered an x-ray. Although the x-ray showed that plaintiff's hand was broken, he was not taken to the hospital until May 29, 2012. At the hospital, his hand was put in a cast, but no medication was ordered. The hospital doctor said that plaintiff should return in three weeks for removal of the cast and commencement of physical therapy, but Dr. McVea did not follow those instructions. Moreover, when plaintiff thereafter made "numerous" complaints of pain, he was simply told to submit "sick call" requests if he needed medical assistance. Although he followed those instructions, no medical care was provided.

Plaintiff's cast was removed at the hospital on August 10, 2012, and the hospital specialist ordered that he be given physical therapy. Rather than transporting plaintiff to the hospital for therapy, the therapy was initially administered at the prison. He was not taken to the hospital for physical therapy until November 6, 2012.

This Court is required to screen plaintiff's complaint. Federal law mandates that federal courts "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). Regarding such lawsuits, federal law further requires: "On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous ...." 28 U.S.C. § 1915A(b)(1). Similarly, with respect to actions filed *in forma pauperis*, such as the instant lawsuit, federal law provides: "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... is frivolous ...." 28 U.S.C. § 1915(e)(2)(B)(i).

A complaint is frivolous "if it lacks an arguable basis in law or fact." Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994). In making a determination as to whether a claim is frivolous, the Court has "not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." Neitzke v. Williams, 490 U.S. 319, 327 (1989); Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994). Although

broadly construing plaintiff's complaint,[1] the undersigned recommends that, for the following reasons, plaintiff's complaint be dismissed as frivolous.

In order to conduct the screening mandated by federal law, the undersigned obtained and reviewed certified copies of plaintiff's medical records.[2] Those records clearly establish that his medical care at the prison was not so inadequate as to violate federal law for the following reasons.

As a preliminary matter, it is important to note that an inmate's constitutional right to medical care is extremely limited. Indeed, the federal constitutional rights of an incarcerated person, regardless of whether he is a pretrial detainee or a convicted prisoner, are violated *only* if his serious medical needs are met with deliberate indifference on the part of penal authorities. See Thompson v. Upshur County, Texas, 245 F.3d 447, 457 (5th Cir. 2001); Harris v. Hegmann, 198 F.3d 153, 159 (5th Cir. 1999).

The United States Fifth Circuit Court of Appeals has explained that "[a] serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." Gobert v. Caldwell, 463 F.3d 339, 345 n.12 (5th Cir. 2006). For the purposes of this opinion, the undersigned will assume that plaintiff's injured hand qualified as a serious medical need.

However, as noted, plaintiff must *also* be able to show that his serious medical need was met with deliberate indifference. The United States Fifth Circuit Court of Appeals has observed:

---

[1] The court must liberally construe a *pro se* civil rights complaint. See Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994).

[2] Those records have been filed into this federal record. Plaintiff was also provided with a copy of the records for his review and use in this proceeding.

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Rather, the plaintiff must show that officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Furthermore, the decision whether to provide additional treatment is a classic example of a matter for medical judgment. And, the failure to alleviate a significant risk that the official should have perceived, but did not is insufficient to show deliberate indifference.

Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001) (quotation marks, brackets, and citations omitted). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997); see also Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

In the instant case, plaintiff's records include the following documents concerning his hand injury:

- On April 29, 2012, plaintiff was seen in the housing tier for a routine sick call complaining of hand pain. An appointment was made with the prison doctor, plaintiff was instructed to keep ice on his hand, and Ibuprofen was prescribed.

- On April 30, 2012, plaintiff was seen by the doctor, x-rays were taken, and his hand was placed in a splint. The x-rays showed that his hand was fractured, and he was referred to the LSU Orthopedic Clinic.

- On May 6, 2012, plaintiff wrote to Nurse Carter requesting pain medication. On May 9, 2012, she responded: "According to your medical record Nurse Boesch, RN gave you Motrin for 3 days and has documented that the security officer gave you the medication. If you are experiencing problems then you need to attend routine

>  sick call. You were seen and evaluated by the doctor on 4/30/12 and he did not prescribe any medication. He did a referral for you to be seen in the Orthopedic Clinic which has been requested. We have not yet received a confirmed date for you to attend the clinic."

- On May 29, 2012, plaintiff was sent to the LSU Orthopedic Clinic. He hand was placed in a cast, and it was recommended that he return for x-rays and a follow-up.
- On June 12, 2012, follow-up x-rays were taken.
- On July 6, 2012, plaintiff wrote to Nurse Carter complaining that his cast had not been removed. On July 11, 2012, she responded: "We have submitted the request for your return appointment but have not received a confirmed date for you attend the clinic. As soon as we get the confirmed date you will be transported there to attend the clinic."
- On August 10, 2012, plaintiff was seen at LSU Orthopedic Department. His cast was removed, and it was recommended that he receive occupational therapy and return in approximately six weeks for a follow-up examination and x-rays.
- On August 13, 2012, the jail doctor referred plaintiff for occupational therapy.
- On August 16, 2012, plaintiff was seen in the housing tier for a routine sick call complaining of hand pain. His chart was sent to the jail doctor for evaluation, and it was noted that a request had been made for an occupational therapy appointment and Tylenol was prescribed for pain. Follow-up x-rays were also taken on that date.

- On August 18, 2012, plaintiff wrote to Nurse Carter with various complaints about medical care. On August 21, 2012, she responded: "According to your medical record you were seen on 8/16/12 by EMT Forbes at sick call. When Dr. McVea reviewed the sick call records he wrote an order for Tylenol three times a day for you for 3 months. The return appointment is for 6 weeks from the time you were seen and this as well as the physical therapy appointment have been requested. University has not been scheduling appointments for the last 3 to 4 weeks because they are changing systems. We can not send you to a clinic without a confirmed appointment date."
- On August 23, 2012, plaintiff was seen in the housing tier for a routine sick call complaining of hand pain. His chart was sent to the jail doctor for evaluation, and it was noted that a request had been made for an occupational therapy appointment.
- On September 5, 2012, plaintiff was seen in the housing tier for a routine sick call complaining of hand pain. His chart was sent to the jail doctor for evaluation.
- On September 11, 2012, plaintiff was seen by the jail doctor, who noted that an appointment for occupational therapy had been requested and that a follow-up consultation had been scheduled at the orthopedic clinic. The doctor also prescribed Ultram for pain.
- On September 25 and 30, 2012, plaintiff wrote to Nurse Carter with various questions and concerns about his medical care. On October 4, 2012, she responded: "I am responding to both of your letters with this one response. I am not a doctor so

6

> I can not tell you what is or is not wrong with your hand. I have already informed you that according to Departmental Regulation #B-06-001 HC # 33 we can not make copies of medical records for offenders. If you are experiencing problems then you need to attend routine sick call."

- On October 4, 2012, occupational therapy was initiated at the prison.
- On October 5, 2012, plaintiff wrote letters to Assistant Warden Cook and Nurse Carter complaining about his therapy. On October 11, 2012, Carter responded: "According to your medical record you are to go to dressing change every night to do the exercises for your hand. The physical therapy appointment has been requested but as I have informed you before, we can not send you or any other offender to a clinic that we do not have a confirmed appointment date for. We do not make these appointments, all we do is request them and follow up on them. The Review Committee at University Hospital makes the determination concerning the appointment date and times. As soon as we receive a confirmed date you will be transported there to attend the clinic. The nursing staff are doing what they have been instructed by the physician to do."
- On October 8, 2012, plaintiff was seen in the housing tier for a routine sick call. He complained that the therapy caused his hand to hurt. It was noted that he was already receiving pain medication, and he was advised to keep his hand elevated.
- On October 11, 2012, plaintiff wrote several letters to Dr. McVea, Assistant Warden Cook, and Nurse Carter about his medical care. On October 16, 2012, Carter

7

    responded: "Your letters have been forwarded to me by Assistant Warden Cook and Dr. McVea for a response. I am responding to your letter to me with this same response. It is not necessary for you to write multiple letters to different staff members concerning the same issue. The request for you to attend physical therapy has been sent to the hospital for them to review and send us a confirmed appointment date. Until such time as we receive an appointment date for you, which the hospitals are cutting back on a lot of clinics and I can not guarantee that you will be scheduled an appointment, you will follow the treatment plan set forth by the doctor. You are to use the putty for 10 minutes and then you can do the rest of the exercises in your cell. You are to touch each finger tip on your right hand to the thumb of the right hand for 2 sets of 10. You are to slowly open and close your right hand for 2 sets of 10. You are to slowly close the right hand to a non tight fist for 2 sets of 10. You are to slowly open the right hand fully for 2 sets of 10. As for the dates on the response form it was the date that the doctor reviewed your sick call complaint. DOPPS/USOP #31 states, A self initiated request is **any** request initiated by the offender whether it be for sick call or an emergency. It does not matter if the offender is seeking treatment for an ongoing or chronic problem for which previously treatment has been sought."

- On October 19, 2012, plaintiff was approved to receive "therapeutic clay" to exercise his hand.

- On October 19 and 21, 2012, plaintiff wrote to Nurse Carter with complaints about his therapy. On October 25, 2012, she responded: "I have instructed the staff to allow you to do the exercises as prescribed by the doctor."

- On October 25, 2012, plaintiff wrote to Nurse Carter asking why he was not receiving physical therapy. On November 1, 2012, Nurse Breeland responded: "Please be advised that your letter has been forwarded to me for a response in the absence of Ms. Carter. We have requested an outside appointment for you to go to Physical Therapy and we have received a confirmed date for you to be transferred to the Physical Therapy Clinic."

- On October 30, 2012, plaintiff was seen by the prison doctor complaining about the fact that he was not receiving outside physical therapy. The doctor noted that plaintiff was receiving physical therapy at the prison (although he was not participating fully), that an outside appointment had been requested, and that therapy at the prison would continue until time for the outside appointment.

- Plaintiff was taken to the Bogalusa Medical Center for physical therapy on November 5, 2012, and a follow-up visit was scheduled.

- Plaintiff was taken to the Bogalusa Medical Center for physical therapy on November 9, 2012, and a follow-up visit was scheduled.

- Plaintiff was taken to the Bogalusa Medical Center for physical therapy on November 14, 2012, and a follow-up visit was scheduled.

- On November 15, 2012, plaintiff was seen on the housing tier for a routine sick call complaining of hand pain. His chart was forwarded to the doctor for review.

- Plaintiff was taken to the Bogalusa Medical Center for physical therapy on November 16, 2012, and a follow-up visit was scheduled.

- On November 19, 2012, plaintiff wrote to Nurse Carter asking why he had not received pain medication since November 11. The following day, she responded: "Your Ultram order discontinued on 11/11/12 and the doctor has not reviewed your medical record from your sick call encounter yet. He will be the one that makes the medical decision of whether or not he is going to reorder it."

- Plaintiff was taken to the Bogalusa Medical Center for physical therapy on November 21, 2012, and a follow-up visit was scheduled.

- On November 28, 2012, plaintiff was seen on the housing tier for a routine sick call complaining of hand pain. His chart was forwarded to the doctor for review and pain medication was ordered.

- Plaintiff was taken to the Bogalusa Medical Center for physical therapy on November 30, 2012, and a follow-up visit was scheduled.

- Plaintiff was taken to the Bogalusa Medical Center for physical therapy on December 7, 2012. On that same date, he was discharged from therapy because the goals had been met; however, it was recommended that he be sent for a follow-up visit to the orthopedist.

10

- On December 9, 2012, plaintiff wrote to Dr. McVea asking to be seen. The following day, Nurse Carter responded: "Your letter has been forwarded to me by Dr. McVea for a response. ... You have not attended sick call since 11/28/12 and Dr. McVea reviews all sick call encounters. At that time he prescribed Naprosyn 500 mg twice a day for 3 months. You have made no other complaints since that time. If you are having the problems stated in your letter you need to attend routine sick call. ..."
- On December 12, 2012, plaintiff was seen on the housing tier for a routine sick call complaining of hand pain. His chart was forwarded to the doctor for review, and the next day a referral request was sent to the LSU Health System for a follow-up examination by the orthopedic department.
- On January 10, 2013, plaintiff was seen on the housing tier for a routine sick call. He requested stronger pain medication, and his chart was forwarded to the doctor for review.
- On February 10, 2013, plaintiff was seen on the housing tier for a routine sick call complaining of hand pain (along with other unrelated medical issues). However, the examination notes indicate that there was no swelling, bruising, evidence of fracture, or any other objective findings to support the complaints.
- On March 6, 2013, plaintiff wrote to Nurse Breeland inquiring about being sent to the orthopedic clinic. On March 13, 2013, she responded: "Please be advised that we have requested your hand clinic appointment but we have not received a

confirmed date yet but when we receive your appointment you will be transferred to the clinic on that date."

- Also on March 6, 2013, plaintiff wrote to Assistant Warden Cook stating that he was not being seen by the doctor despite submitting sick call requests and complaining that he was still being charged medical co-pay fees. On March 11, 2013, he wrote to Nurse Carter inquiring about why he was not receiving physical therapy. On March 14, 2013, Nurse Carter responded: "Your letter has been forwarded to me by Warden Cook for a response. I am responding to your letter to me with this same response. The doctor reviews all the sick call encounters and makes the medical determination of whether an appointment to see him is indicated. The medical access fees are for accessing medical care and is not contingent on whether or not you are seen by the doctor. The physical therapy was ordered here until you were seen in Physical Therapy. Once Physical Therapy discharged you there was no other order given for use of the putty. A referral was done for you to be seen in the Orthopedic Clinic. This referral was sent to the Review Committee for their review and approval. We have not received a confirmed date for you to attend the clinic."
- Also on March 6, 2013, plaintiff was seen in the prison infirmary for a routine sick call for hand and neck pain. Tylenol was administered and his chart was sent to the doctor for review.
- On March 10, 2013, plaintiff wrote Nurse Carter asking about the discontinuation of his physical therapy. On March 11, 2013, she responded: "The PT was stopped by

12

    the hospital on 12/7/12. A referral was sent to the Review Committee for approval for a Orthopedic Clinic appointment. This has been approved for you to be seen in the Tele Medicine Orthopedic Clinic but they have not given us a date for you to be seen. As soon as we receive an appointment date your name will be placed on a call out for that date."

- On March 24, 2013, plaintiff wrote Nurse Carter, asking: "I am writing to you in the concerning of my right hand, I will like to know when was my lasted visit to the R.C.C. 'orthopedic clinic'?" On March 27, 2013, Nurse Carter responded: "There is not an Orthopedic Clinic at RCC so I do not know what you are referring to. You have been referred to be seen in the Orthopedic Hand Clinic but they have not given us a confirmed date for you to be seen. As soon as we receive the confirmed date you will be seen in the clinic."

- A Telemed Summary Sheet dated April 22, 2013, states: "Offender to Infirmary in stable condition for Telemed appt. Ortho instructed offender that no surgery was recommended, but he insisted he wanted to have surgery." Dr. McVea ordered: "Follow up in Hand Clinic Face to Face for evaluation for surgery."

- On May 27, 2013, plaintiff submitted a written inquiry concerning whether he would be taken back to the "orthopedic hand clinic." The following day, Nurse Breeland responded: "Please be advised that we have requested the follow-up appointment with the Ortho/Hand Clinic but we have not received an appointment date yet but as soon as we do we will transfer to your appointment."

13

Plaintiff then filed this lawsuit shortly thereafter in June of 2013.

It is clear that "[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995). That is certainly the case here. Based on plaintiff's records, it is beyond cavil that the defendants did not refuse to treat him, ignore his complaints, intentionally treat him incorrectly, or engage in any similar conduct evincing a wanton disregard for his medical condition. Rather, on the contrary, they even arranged for him to receive repeated evaluations and treatment by outside specialists in addition to care he was receiving from the prison medical staff.

That, of course, is not to say that plaintiff's care was optimal or that all of his concerns were resolved to his satisfaction. However, that simply was not required. The fact that an inmate's medical treatment "may not have been the best money could buy" is insufficient to establish a federal violation. Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992); see also Gobert v. Caldwell, 463 F.3d 339, 349 (5th Cir. 2006) ("[D]eliberate indifference exists wholly independent of an optimal standard of care."); McMahon v. Beard, 583 F.2d 172, 174 (5th Cir. 1978). Therefore, if an inmate in fact received medical treatment, federal constitutional protections were not violated just because that treatment was unsuccessful or because pain persisted despite the treatment. Gobert, 463 F.3d at 346; Williams v. Chief of Medical Operations, Tarrant County Jail, No. 94-10115, 1994 WL 733493, at *2 (5th Cir. Dec. 27, 1994); Kron v. Tanner, Civ. Action No. 10-518, 2010 WL 3199854, at *7 (E.D. La. May 19, 2010), adopted, 2010 WL 3171040 (E.D. La. Aug. 6, 2010). Moreover, the federal constitution does not require even that an inmate's medical care have been free from negligence or medical malpractice. Hall v. Thomas, 190 F.3d 693, 697-98 (5th Cir. 1999); see also

14

Kelly v. Gusman, Civ. Action No. 07-611, 2007 WL 2007992, at *4 (E.D. La. July 5, 2007); Cerna v. Texas Tech Medical Staff, No. 2:03-CV-0322, 2004 WL 42602, at *2 (N.D. Tex. Jan. 7, 2004). Claims of negligence or malpractice present issues of *state* law for *state* courts, not federal constitutional issues for a federal court. See Estelle v. Gamble, 429 U.S. 97, 107 (1976); Cerna, 2004 WL 42602, at *2.

The fact that plaintiff apparently believes that more could have been done for him is of no moment. Absent exceptional circumstances, a prisoner's disagreement with his medical treatment simply does not constitute deliberate indifference. Gobert, 463 F.3d at 346. For example, "the question of whether ... additional ... forms of treatment is indicated is a classic example of a matter for medical judgment." Estelle, 429 U.S. at 107. Generally, such matters of professional medical judgment are better left to the medical expertise of physicians rather than to the legal expertise of judges. Federal courts are therefore loath to second-guess such medical decisions in federal civil rights actions. Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."); Castro v. Louisiana, Civ. Action No. 08-4248, 2008 WL 5169401, at *4 (E.D. La. Dec. 8, 2008) ("[M]edical judgments are not to be lightly second-guessed in a federal civil rights action."). There is no basis whatsoever to engage in such second-guessing here.

In summary, the determinative issue before the Court is not whether the medical treatment plaintiff received was subpar in some respect, whether his medical problem persisted despite treatment, or whether he was dissatisfied with his care; rather, it is only whether his serious medical

15

need was met with *deliberate indifference*. As noted, it is clear that there was no deliberate indifference in this case. Plaintiff's claim to the contrary is legally frivolous.

### **RECOMMENDATION**

It is therefore **RECOMMENDED** that plaintiff's complaint be **DISMISSED WITH PREJUDICE** as frivolous.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[3]

New Orleans, Louisiana, this seventh day of October, 2013.

                                                **SALLY SHUSHAN**
                                                **UNITED STATES MAGISTRATE JUDGE**

---

[3] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.